# EXHIBIT A

# **U.K**HealthCare

February 13, 2007

Mr. A. Ronald Turner
Samaritan Alliance, LLC
Associated Healthcare Systems, Inc.
Associated Healthcare Systems of Lexington, LLC
214 Overlook Court, Suite 260
Brentwood, TN 37027

Mr. T. Richard Riney
Executive Vice President, General Counsel and Secretary
Ventas Realty, Limited Partnership
10350 Ormsby Park Place, Suite 300
Louisville, Kentucky 40223

**CONFIDENTIAL**

RE:    Proposed Acquisition of Samaritan Hospital and Medical Office Building

Dear Mr. Turner and Mr. Riney:

The University of Kentucky is considering either directly or through a credit worthy wholly owned subsidiary, affiliated entity or support organization (e.g. Kentucky Medical Services Foundation, Inc.)(collectively "UK"), entering into an asset purchase agreement with Samaritan Alliance, LLC ("Samaritan") to purchase all or substantially all of Samaritan's assets (the "Samaritan Assets") related to the operation of Samaritan Hospital, a 336 bed hospital facility located at 310 South Limestone Street, Lexington, Kentucky ("Samaritan Hospital") and related medical office building, located at 125 E. Maxwell Street, Lexington, Kentucky ("MOB") (the Samaritan Hospital and MOB are collectively, referred to as the "Hospital"); to enter into either a sale with purchase money financing or a lease with an option to purchase after the end of the fifth (5th) year, the Hospital assets currently leased by Ventas Realty, Limited Partnership ("Ventas") to Samaritan (the "Ventas Assets"); and to retain certain employees of Samaritan, and of Associated Healthcare Systems, Inc. and/or Associated Healthcare Systems of Lexington, LLC (collectively "Associated") involved in the operation of Hospital.  In this letter, (i) UK, Samaritan, Ventas and Associated are sometimes referred to as the "Parties," and (ii) UK's possible acquisition of the Ventas Assets and the Samaritan Assets and the purchase agreement or new lease with Ventas are sometimes together referred to as the "Possible Acquisition," and (iii) the leases between Ventas and Samaritan are referred to as the "Leases," and (iv) Samaritan, Associated and Ventas are referred to individually as "Seller" and collectively as the "Sellers."

**Office of the Executive Vice President for Health Affairs**

317 Wethington Building • 900 South Limestone • Lexington, Kentucky 40536-0200
Phone: (859) 323-5126 • Fax: (859) 323-1918 • www.ukhealthcare.uky.edu

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 2

Set forth below is a summary of certain terms and conditions being considered by UK for the Possible Acquisition. This letter is not an offer or agreement to acquire the Hospital or the assets leased by Ventas under the Leases. Except for the paragraphs under Part Two of this letter which are binding and obligate the Parties to their terms: (i) the remaining paragraphs of this Letter of Intent are non-binding and do not obligate the Parties in any manner; (ii) this Letter of Intent is not based on any agreement between the Parties; and (iii) the Parties do not intend to be bound by any agreement (except, as to Ventas and Samaritan, those agreements, including the Leases, to which they are already parties) until both agree to and sign a formal written contract.

The Parties wish to commence negotiating definitive written agreements providing for the Possible Acquisition (collectively, "Definitive Agreement"). To facilitate the negotiation of a Definitive Agreement, the Parties request that UK's counsel prepare an initial draft of such Definitive Agreement, which shall include as an exhibit a form of lease or purchase agreement of the Ventas Assets. The Parties would like to execute the Definitive Agreement by April 1, 2007 and, subject to successful completion of due diligence, to close the transaction by May 1, 2007 ("Closing Date"). However, if the Definitive Agreement is not fully executed by April 16, 2007 for any reason other than mutual written agreement of the parties, this letter will terminate and be null and void, except that the paragraphs under Part Two of this letter, except for paragraph 2 of Part Two, shall in all events be binding upon the Parties in accordance with their terms and the rights and remedies for a breach of same shall survive the Closing Date. Nothing contained in this Agreement shall diminish Ventas's ability to enforce its rights under the Leases and related documents prior to the Closing Date, to protect the Hospital or otherwise.

## PART ONE

The following paragraphs under Part One of this letter are nonbinding and do not contain all of the material terms necessary for a complete agreement between the Parties regarding the Possible Acquisition. Although nothing in this letter obligates the Parties to negotiate or to acquire or sell the Samaritan Assets and the Ventas Assets, it is proposed and will be reflected in any Definitive Agreement as follows:

1.    <u>Purchase of Assets from Samaritan</u>. Samaritan and Associated would sell all of the Samaritan Assets (which are the assets necessary to the operation of Hospital) free and clear of all liens, claims, options, encumbrances and restrictions except as set forth in paragraph 4 at the price set forth below. Associated will be expected to guaranty the obligations of Samaritan's representations and warranties in the Definitive Agreement.

It is expected that certain assets of Samaritan could be excluded from the Acquisition as specified in the Definitive Agreement upon agreement of Samaritan and UK. Samaritan will supply UK with a list of such assets and their appropriate value for approval ("Excluded Assets").

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 3

    2.    <u>Purchase or Lease of Assets from Ventas</u>. UK, either directly or through a wholly owned subsidiary, affiliated entity or a support organization, will either (with a determination as to which option it will elect to pursue being determined by February 23, 2007):

    a.    Enter into a purchase agreement for the purchase of all of the Ventas Assets (collectively with the Samaritan Assets, the "Assets"). The purchase price shall be $35,000,000 and shall be financed with purchase money mortgage financing from Ventas of 80%-90% (as determined by Ventas) of the purchase price. Such financing shall have an interest rate of 8% per annum, shall amortize over 20 years, shall not be prepayable and shall have a maturity date five (5) years after the Closing Date; or

    b.    Enter into a one-year lease with annual renewals through the expiration of the initial terms of the Leases in 2020. UK will have an option to purchase the Ventas Assets at the end of the fifth (5th) year of the lease for $35,000,000 (the "Option Price") and at any time thereafter upon 90 days notice for the then applicable Escalated Option Price (as defined below). The lease shall provide that in the event UK does not renew at the end of any one-year term, the UK lease obligations and rights, except the option to purchase which shall be retained by UK so long as the lease is not in default, shall be assigned to Kentucky Medical Services Foundation, Inc. ("KMSF") which shall be responsible for paying amounts due under the lease until the earlier of the purchase of the Ventas Assets by UK or the expiration of the last renewal term in 2020. The Option Price (as increased, the "Escalated Option Price") shall increase annually if UK does not exercise its option to purchase the Ventas Assets at the end of the fifth (5th) year. At Ventas's option, the lease shall include a right in favor of Ventas to put the Ventas Assets to UK upon 90 days notice (i) at any time through the end of the fifth (5th) year at the Option Price, and (ii) at any time after the fifth (5th) year at the then applicable Escalated Option Price. Ventas would lease the Ventas Assets to UK or its designee on an "as-is" basis except for (i) representations and warranties as to title reasonably required to allow a title insurance company to issue a leasehold policy of title insurance to UK at Closing and (ii) delivery by Ventas to UK of all material information in Ventas's possession regarding the condition of the Property and a representation by Ventas that, to its knowledge, it has delivered all such information in its possession to UK.

Ventas shall not encumber the Ventas Assets with financing or other encumbrances prior to the transfer of the Ventas Assets to UK pursuant to one of the options set forth in this paragraph 2, other than liens, claims, options, encumbrances and restrictions that will be removed upon transfer of the Ventas Assets to UK or have been approved by UK prior to the encumbrance.

On the Closing Date, the Leases will terminate, but Samaritan shall retain responsibility for obligations relating to the period of its tenancy, which obligations shall be secured by any payments to Samaritan and its affiliates in connection with the Possible Acquisition. All letters of credits issued to Ventas on behalf of Samaritan will be released on the Closing Date provided that Ventas

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 4

has received reasonably acceptable evidence of the payment or satisfaction of all known obligations and liabilities of Samaritan under the Leases.

3.    Assignment of GE Loan.  After execution of this Letter of Intent, KMSF, on or before February 23, 2007, intends to enter into an agreement to take assignment of all rights of General Electric Capital Corporation ("GE") under the Revolving Loan Note and Loan Agreement dated October 18, 2005, as amended and all instruments, agreements, filings, other documents and rights of GE related thereto, (the "GE Loan") between GE and Samaritan and Associated, and KMSF will take an assignment of all security interests granted to GE under the GE Loan including all of Samaritan's Hospital accounts receivable and any other security interest GE may hold in the Hospital accounts receivable.  Samaritan will warrant that (i) all of the outstanding GE Loan in the current approximate principal amount of $5,600,000 has been used for the benefit of Samaritan and no other entity, (ii) all accounts receivable represent bona fide indebtedness owing to Samaritan for services actually performed or for goods or supplies actually provided with no known set-offs, deductions, compromises, or reductions, and (iii) the GE Loan is properly documented, perfected, enforceable and creates a first priority security interest in favor of GE Capital that can be assigned to KMSF and/or UK.  Samaritan and/or Associated will pay GE all charges, expenses and fees due and owing pursuant to the terms of the GE Loan to permit KMSF to take the assignment.  After taking assignment, KMSF will permit further advances under the GE Loan, provided that in no event would the total amount paid by KMSF to GE for the assignment plus the principal amount of any such further advances under the GE Loan exceed $9,000,000, unless UK and KMSF agree to increase such amount in their sole discretion.  Further, any payment to GE and/or additional advance of additional loan proceeds will only be made if KMSF will obtain a properly perfected first priority security interest in the accounts receivable to secure such payment and/or advance.  Samaritan shall obtain releases of all other security instruments and liens on such accounts receivable, other than from Ventas; the rights of Ventas to such accounts receivable shall be subordinate to those of KMSF pursuant to the existing Intercreditor Agreement between Ventas and GE, which shall remain in place.  As part of taking assignment of the GE Loan and making further advances thereunder by KMSF, Samaritan shall execute an agreement to use the proceeds of such advances to pay all taxes due and owing to the Commonwealth of Kentucky and the United States from Samaritan.  All such taxes and other obligations of Samaritan and its affiliates with respect to the Hospital must be discharged on or prior to the Closing Date.

4.    Assumption of Liabilities.  While UK would generally purchase all assets free and clear of liabilities, UK may assume certain liabilities under existing contracts, relative to the operations of the Hospital.  Any assumed liabilities will be specifically set forth in the Definitive Agreement.  The Definitive Agreement will also specifically provide that UK will not assume any liability not set forth in the Definitive Agreement and that any liability not specifically assumed shall remain the responsibility of Samaritan, Ventas or Associated, as applicable.  UK does not intend to operate under Samaritan's Medicare provider number.  Ventas shall not assume any obligations or

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 5

liabilities of Samaritan or Associated, provided however, that Ventas shall not be relieved of any obligations under the purchase or lease agreement with UK with respect to any representations and warranties provided by Ventas thereunder.

     5.     Purchase Price. The purchase price for the Samaritan Assets would consist of the assumption of certain agreements related to the operation of the Hospital effective as of the Closing Date and cash in an amount sufficient to repay all amounts due and owing under the GE Loan as assigned to KMSF, plus an amount estimated to be $3,000,000 dependent on the amount of liabilities assumed and the amount required to repay the GE Loan to KMSF. Such purchase of the Samaritan Assets would be conditioned upon either execution of a purchase agreement or execution of a new lease agreement with Ventas for the Ventas Assets effective as of the Closing Date. The cash amount of the purchase price for the Samaritan Assets shall be paid to Samaritan and Associated in accordance with their interest(s) in immediately available funds at the Closing. In no event will the purchase price paid under this paragraph 5, exceed the total of $12,000,000.

     6.     Obtaining Approvals. Samaritan and Associated shall use their best efforts to obtain or assist UK in obtaining all necessary or appropriate consents and approvals of third parties and regulatory authorities to the Possible Acquisition and the transactions necessary to consummate the Possible Acquisition including consents to assignments or amendments of contracts and estoppel certificates. Ventas will reasonably cooperate in connection therewith. Upon execution of the Letter of Intent, UK will file the Notice of Intent to Acquire with the Kentucky Cabinet for Health and Family Services, Division of Certificate of Need.

     7.     Other Agreements.

          a.     At the Closing:

          (i)     The current manager of Hospital would, at UK's election, enter into a Consulting Agreement for a minimum two year term under which such entity would provide consulting services to the Hospital as an independent contractor on terms and conditions to be agreed upon;

          (ii)     Samaritan and Associated would execute an agreement in favor of UK and the Hospital with reasonable time limits which would contain non-competition, non-solicitation and no-hire provisions in favor of UK and Hospital; provided, however, there will be a specific exclusion with respect to the non-competition covenant for the CON issued to Associated Healthcare Systems of Jessamine County, Inc. (check as it may be a LLC) and the CON application filed by Associated for the construction and operation of a 50-bed general acute hospital in Jessamine County, Kentucky; and

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 6

      (iii)    Samaritan, Associated, and UK would enter into a transition agreement under which Samaritan and/or Associated would provide UK or affiliated entities or support organizations of UK with transitional use of certain systems and services for a period not to exceed two years and may involve a negotiated amount depending on the scope of the systems or services.

      b.    Prior to Closing:

      (i)    UK would enter into a consulting agreement no later than ten (10) business days after execution of this Letter of Intent under which UK would provide interim consulting and resources to assist Samaritan, its current employees and Associated to operate the Hospital for the period ending on the earlier of the Closing Date or April 1st if no Definitive Agreement has been executed by that date.

Any payments to Samaritan, Associated or any of their affiliates pursuant to agreements described in this paragraph 7 shall be subordinate to obligations to Ventas.

      8.    <u>Employees</u>.  Samaritan would after execution of the Definitive Agreement and prior to the Closing Date comply with all applicable WARN Act requirements.  UK intends to, either directly through a subsidiary or affiliated entity or through the Kentucky Medical Services Foundation, Inc., to employ all or substantially all of the employees employed by either Samaritan or Associated to work at the Hospital ("Hospital Employees") post closing.  Samaritan and Associated shall work with UK to allow UK to retain those employees.

      9.    <u>Contingencies</u>.  The Closing shall not occur unless and until all of the following conditions have been satisfied:

      a.    Any necessary approval has been obtained from the UK Board of Trustees and the governing board of KMSF;

      b.    Any necessary approval has been obtained from the governing boards of Samaritan and Associated;

      c.    Completion of UK's due diligence investigation with results satisfactory to it, including but not limited to, condition of title to the Property being satisfactory to UK (as evidenced by a commitment for title insurance satisfactory to UK);

      d.    Any necessary Ventas internal corporate approval has been obtained;

      e.    Consents and approvals from all third parties deemed necessary or appropriate by UK in connection with the Possible Acquisition have been obtained; and

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 7

    f.      Execution and delivery of all necessary and appropriate closing documents.

## PART TWO

The following paragraphs under Part Two of this letter are the legally binding and enforceable agreements of the Parties ("Binding Provisions").

1.    **Access**. Until the Closing Date, Samaritan, Associated and Ventas will afford UK and its representatives reasonable access to the Hospital including the personnel, properties, contracts, books and records, and all other documents and data upon two business days advance notice and cause Samaritan's, Associated's and Ventas's representatives to cooperate fully with UK and its representatives in connection with UK's due diligence investigation of the Hospital, including financial, marketing, employee, legal, regulatory and environmental matters. Ventas and Samaritan have certain environmental information relating to the Hospital and Property which will be provided to UK. This letter authorizes UK and its representatives, upon at least two business days prior written notice, to access Ventas's and Hospital's property to confirm the results of the reports and, if UK deems it necessary, conduct additional assessments. UK may select an environmental consultant and determine the scope of work not inconsistent with this paragraph 1. UK will bear the fees, costs and expenses in connection with any further reports (and will provide a copy of such reports to the other Parties upon written request). UK will perform the investigation and its due diligence in a manner that minimizes disruption of the Hospital and the Hospital Employees. Further, in no event will UK be allowed to initiate discussions with any governmental agency in connection with environmental matters under this paragraph 1 without the prior written consent of Ventas and Samaritan unless such disclosure is mandated by law.

All actions taken by or on behalf of UK under this paragraph 1 ("Inspections") shall be in accordance with all applicable laws, rules and regulations of the appropriate governmental authorities having jurisdiction over the Ventas Assets. UK shall (A) restore the Ventas Assets to the condition which existed immediately prior to each of the Inspections, and (B) prior to and as a condition to any Inspections, deliver to Ventas certificates of insurance evidencing comprehensive liability insurance with a combined single limit of at least $2,000,000, in a form reasonably acceptable to Ventas, and naming Ventas as an additional insured.

2.    **Exclusive Dealing**. Until the date (the "Exclusivity Period") that is (i) the earlier of the Closing Date or the termination of the Definitive Agreement, if a Definitive Agreement has been entered into, or (ii) April 16, 2007 if a Definitive Agreement has not been entered into by that date or (iii) the time period extended by mutual agreement of the Parties, neither the Hospital, Samaritan, Associated nor Ventas will, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept, or consider any proposal of any other person relating to the acquisition of the Assets or Hospital business, in whole or in part, whether directly or indirectly, through purchase, merger, consolidation, or otherwise (other

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 8

than sales of inventory in the ordinary course, of the excluded assets or transferees referenced in
paragraph 1 of Part One above).  The Exclusivity Period may be terminated by Ventas if at any time
(i) the assignment contemplated by paragraph 3 of Part I of this letter has not occurred by February
23, 2007, (ii) payroll taxes or provider taxes relating to the Hospital have not been paid on or prior to
February 28, 2007, (iii) as of February 28, 2007, Hussing Mechanical Contractors, Inc. ("Hussing")
has not been paid in full or agreed to forbear from taking any action with respect to the enforcement
or creation of any mechanics lien through the Closing Date, (iv) Hussing has commenced foreclosure
of any lien against the Property, (v) proceedings with respect to Samaritan or Associated have been
commenced under the United States Bankruptcy Code, or (vi) rent payment and escrow deposits
required to be paid or made by the tenant under the Leases for the month of March 2007 have not
been paid by February 28, 2007 or, commencing with the month of April 2007, rent payment and
escrow deposits required under the Leases for any given month have been paid fewer than 30 days in
advance.  As of the date this letter is executed, Ventas holds no right to terminate the Exclusivity
Period.

     3.    **Conduct of Business**.  Until the Closing Date, Samaritan and Associated will operate
the Hospital in the ordinary course and refrain from any extraordinary transactions, including:

     a.    disposing of any Assets (other than the Excluded Assets referenced in
paragraph 1 of Part One above) of the Hospital, Associated or Samaritan, except in the ordinary
course of business;

     b.    materially increasing the annual level of compensation of any Hospital
Employee, and not increasing at all the annual level of compensation of any person whose
compensation from Samaritan or Associated in the last preceding fiscal year exceeded $50,000, and
not granting any unusual or extraordinary bonuses, benefits or other forms of direct or indirect
compensation to any Samaritan or Associated employee, officer, director or consultant, except in
amounts in keeping with past practices by formulas or otherwise;

     c.    increasing, terminating, amending, or otherwise modifying any plan for the
benefit of Hospital Employees or modifying any plan for the benefit of any other employee of
Samaritan or Associated that would result in a change in a plan for the benefit of Hospital
Employees;

     d.    entering into any other agreement (or group of agreements) relating to the
Hospital or any Samaritan Asset, the performance of which will extend beyond the Closing Date and
involve consideration in excess of $10,000, without UK's prior consent;

     e.    issuing any equity securities, options, warrants, rights or convertible securities
of Samaritan and declaring or paying any dividends or distributions of Samaritan or Associated;

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 9

       f.     expending any funds for capital improvements, other than for equipment and scheduled maintenance in an amount not to exceed $10,000 except with UK's prior approval or in cases of emergency; or

       g.     entering into any managed care contracts, third party payor or governmental contracts without prior consent of UK.

    4.    **Confidentiality**. The Nondisclosure Agreement dated January 29, 2007 (the "Confidentiality Agreement") shall continue to govern the conduct of the Parties with respect to the Hospital and the Possible Acquisition. The Parties understand and agree that money damages would not be sufficient remedy for any breach of this paragraph 4 and that each Party will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies will not be deemed to be the exclusive remedies for any such breach, but will be in addition to all other remedies available at law or in equity. Upon the written request of a Party after the Closing Date, the other Party will promptly return to the requesting party any Confidential Information in its possession. This Part II will supersede the Confidentiality Agreement to the extent there are conflicts between the agreements.

    5.    **Disclosure**. Notwithstanding the provisions of the Confidentiality Agreement, UK may (i) meet privately with regulators and its Board of Trustees without Ventas's prior consent, provided that a transcript (or, if a transcript is not available, a written summary) of any such meeting shall be delivered to Ventas within one (1) business day after any such meeting (provided, however, that no such transcript or summary shall be required with respect to meetings with UK's Board of Trustees other than open-session meetings), (ii) UK may disclose to UK's and Samaritan's employees and medical staff the existence and general nature of, but not the financial terms of, the Possible Acquisition, and (iii) answer questions at press conferences without Ventas's prior consent, provided that Ventas shall have received notice of such press conference at least two (2) business days in advance and shall have previously approved the prepared remarks to be made at any such press conference (which approval shall not be unreasonably withheld, conditioned, or delayed). The Parties agree that press releases, regulatory filings, and prepared remarks for purposes of a press conference (collectively, "Public Disclosure") constitute "Competitively Sensitive Information" under the Confidentiality Agreement. Ventas agrees (a) not to unreasonably withhold its consent to any Public Disclosure and (b) to review and respond to any request for consent to any Public Disclosure within twelve (12) hours after receipt of written request therefor (or such longer period of time as UK may specify in such request); provided that any such request received after 6:00 p.m. Chicago time shall be deemed to have been received at 9:00 a.m. Chicago time on the following business day for such purposes. Notwithstanding anything in the Confidentiality Agreement to the contrary, any request for consent to Public Disclosure shall be emailed to each of T. Richard Riney (rriney@ventasreit.com), Kristen Benson (kbenson@ventasreit.com), and Joseph Lambert (jlambert@ventasreit.com). If Ventas fails to respond to any such written request to Public

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 10

Disclosure within such twelve-hour period, Ventas will be deemed to have granted its consent to such Public Disclosure.

6.    **Costs**. Each of UK, Samaritan, Associated and Ventas will be responsible for and bear all of its own costs and expenses incurred at any time in connection with pursuing or consummating the Possible Acquisition, including, without limitation, UK being responsible for its investigation and due diligence expenses and UK and Ventas being responsible for their respective legal expenses relating to their transaction for the purchase of all of Ventas's real estate and other assets. Each of the Parties represents and warrants that it has not agreed to pay any amount to any finder or broker in connection with the Possible Acquisition or related transactions. Notwithstanding anything to the contrary in this paragraph 6, nothing herein shall affect any obligation of Samaritan, Associated or any of their affiliates to reimburse any costs or expenses of Ventas or its affiliates (including, but not limited to, Ventas's attorneys fees in connection with the Possible Acquisition) pursuant to any existing agreement, including the Leases.

7.    **Governing Law**. This letter and the rights of the Parties hereunder will be governed by and construed in accordance with the laws of the Commonwealth of Kentucky.

8.    **Venue and Jurisdiction**. Enforcement of this Agreement and any dispute about its terms shall be brought in Franklin Circuit Court, Frankfort, Kentucky.

9.    **Severability**. If any Binding Provision is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Part Two will remain in full force and effect. Any Binding Provision held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

10.   **Insider Trading**. Each party hereto acknowledges that it is aware, and that it will advise its qualified persons who are informed as to the matters that are the subject of this letter agreement, that federal and many state securities laws prohibit any person who has received from an issuer material, non-public information, from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

11.   **Entire Agreement; Amendment; Successors; Assignment**. The Binding Provisions (a) constitute the entire agreement (other than the Confidentiality Agreement) among the Parties relating to the Possible Acquisition and supersede all prior oral or written agreements, understandings, representations and warranties and courses of conduct and dealing among the Parties on the subject of the Possible Acquisition; (b) may be amended or modified only by a writing executed by all of the Parties; (c) are binding on the Parties and their respective heirs, personal representatives, successors, and permitted assigns; and (d) no Party may assign or delegate any of the

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 11

Party's rights or obligations under the Binding Provisions to any person without the prior written consent of the other Parties.

This letter may be accepted in writing by the Sellers until February 13, 2007 and will terminate if not accepted by 8:00 PM Eastern Time on such date. Please sign and date this letter in the space provided below and return a signed copy to the undersigned via facsimile by the indicated time for acceptance with an original to follow. This letter may be executed by the Parties in separate counterparts, each of which when executed and delivered will be an original, but all of which together will constitute one and the same instrument.

[SIGNATURES FOLLOW ON NEXT PAGE]

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 12

Sincerely,

UNIVERSITY OF KENTUCKY

By: _____

Title: *Vice President for Health Affairs & CFO*

KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.

By: _____

Title: *Vice President for Health Affairs & CFO*

Executed and agreed to as of _____, 2007.

Sellers:

**SAMARITAN ALLIANCE, LLC**

By: _____
      A. Ronald Turner, President

**ASSOCIATED HEALTHCARE SYSTEMS
OF LEXINGTON, LLC**

By: _____
      A. Ronald Turner, President

**ASSOCIATED HEALTHCARE
SYSTEMS, INC.**

By: _____
      A. Ronald Turner, President

**VENTAS REALTY, LIMITED
PARTNERSHIP**

By: Ventas, Inc., its General Partner

By: _____

Title: _____

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 12

Sincerely,

UNIVERSITY OF KENTUCKY

By: _____

Title: *Vice President for Health Affairs & CFO*

KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.

By: _____

Title: *Vice President for Health Affairs & CFO*

Executed and agreed to as of  2-13  , 2007.

Sellers:

SAMARITAN ALLIANCE, LLC

By: _____
      A. Ronald Turner, President

ASSOCIATED HEALTHCARE
SYSTEMS, INC.

By: _____
      A. Ronald Turner, President

ASSOCIATED HEALTHCARE SYSTEMS
OF LEXINGTON, LLC

By: _____
      A. Ronald Turner, President

VENTAS REALTY, LIMITED
PARTNERSHIP

By: Ventas, Inc., its General Partner

By: _____

Title: _____
          T. Richard Riney
          Executive Vice President
          and General Counsel

Mr. A. Ronald Turner
Mr. T. Richard Riney
February 13, 2007
Page 12

Sincerely,

UNIVERSITY OF KENTUCKY

By: _____

Title: *Vice President for Health Affairs & CFO*

KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.

By: _____

Title: *Vice President for Health Affairs & CFO*

Executed and agreed to as of _2-13_____, 2007.

Sellers:

SAMARITAN ALLIANCE, LLC

By: _____
    A. Ronald Turner, President

ASSOCIATED HEALTHCARE SYSTEMS
OF LEXINGTON, LLC

By: _____
    A. Ronald Turner, President

ASSOCIATED HEALTHCARE
SYSTEMS, INC.

By: _____
    A. Ronald Turner, President

VENTAS REALTY, LIMITED
PARTNERSHIP

By: Ventas, Inc., its General Partner

By: _____

Title: _____

**<u>EXHIBIT B</u>**

## MASTER AGREEMENT

This Master Agreement ("Agreement") is entered into as of April 12, 2007, by and among SAMARITAN ALLIANCE, LLC ("Samaritan"), ASSOCIATED HEALTHCARE SYSTEMS, INC. ("AHS"), ASSOCIATED HEALTHCARE SYSTEMS OF LEXINGTON, LLC ("AHS Lexington" and collectively with AHS, "Associated"), VENTAS REALTY, LIMITED PARTNERSHIP ("Ventas"), UNIVERSITY OF KENTUCKY ("UK"), and KENTUCKY MEDICAL SERVICES FOUNDATION, INC. ("KMSF") (collectively the "Parties").

## BACKGROUND

A.      Samaritan is party to a lease with Ventas dated February 1, 2005 for a medical office building ("MOB Lease") and also a lease dated February 1, 2005 for a 336 bed hospital ("Master Lease") in Lexington, Kentucky collectively ("Ventas Leases"). Samaritan's lease obligations are guaranteed by AHS, pursuant to a Guaranty of Lease dated February 1, 2005.

B.      On February 13, 2007, the Parties entered into a letter of intent ("LOI") pursuant to which the Ventas Leases were to terminate; UK and Ventas were to enter into a new one-year lease renewable for 12 years together with a Put-Call Agreement for the properties covered by the Ventas Leases ("New Lease") with KMSF as a standby tenant in the event the New Lease terminated before February 29, 2020; KMSF was to take assignment of the loan from General Electric Capital Corporation ("GECC") then with outstanding principal estimated at $5.6 million (later the payout was determined to be $6,391,890.55) and increase the loan line of credit to $9,000,000 with Samaritan accounts receivable as collateral; UK, subject to due diligence, was to enter into an asset purchase agreement with Associated and Samaritan to purchase all assets of

Associated and Samaritan necessary by UK to the operation of the hospital and the medical office building; and this asset purchase agreement was to provide that any liabilities not expressly assumed and designated by UK were to remain with Associated and Samaritan. Part Two of the LOI was binding on the Parties.

C.    Subsequent to the execution of the LOI, KMSF purchased the interest of GECC in the line of credit and amended the loan documents to increase the revolving loan commitment to $10,000,000, and then further amended to increase the revolving loan commitment to $11,000,000 of which over $10,600,000 has been drawn by Samaritan.

D.    UK has determined through its due diligence process that Samaritan's liabilities are over $10,000,000 greater than expected by UK and Samaritan at the time of execution of the LOI. The Parties agree that Samaritan's financial condition is such that the transaction contemplated by the LOI cannot be completed.

E.    Events of Default exist under the Ventas Leases, which entitle Ventas to terminate the Ventas Leases and pursue other remedies.

IN CONSIDERATION of the foregoing recitals and the covenants contained in this Agreement, the Parties agree as follows:

## ARTICLE 1

### TERMINATION OF LEASES AND NEW LEASE

1.    On April 12, 2007 (the "Notice Date"), UK and Ventas will execute the New Lease in the form attached hereto as Exhibit A, which will be effective only upon the termination

2

of the Ventas Leases.

2.      Concurrent with the execution of the New Lease, Ventas will deliver notices in the form attached hereto as Exhibit B relating to the Master Lease ("Termination and Transition Notice") and Exhibit C relating to the MOB Lease ("Termination Notice"), pursuant to the terms of the Ventas Leases to terminate the Ventas Leases the next business day ("Termination Date") and give Samaritan a Transition Notice pursuant to the Ventas Leases and designate UK as the "Successor Operator" under the terms of the Ventas Leases.  Ventas will concurrently give KMSF notice of termination of the Ventas Leases by delivery of a copy of the Termination and Transition Notice to KMSF.  Ventas shall instruct Samaritan to, and Samaritan shall, notify any third parties which hold any rights to possession or use of any of the premises leased under the Ventas Leases that are subordinate to the Ventas Leases and have not been approved by Ventas pursuant to the Ventas Leases, that the Ventas Leases have been terminated and therefore, such third party rights are also terminated.  Ventas shall attach to the Termination and Transition Notice and the Termination Notice, as applicable, a list of all leases or other rights to possession or use of the premises that have been approved by Ventas.  Samaritan shall comply with such requirement and direction on the Termination Date.  On the Termination Date, the Ventas Leases will terminate, but Samaritan shall retain responsibility for all other obligations relating to the period of its tenancy and for obligations surviving termination of the Ventas Leases pursuant to the terms of the Ventas Leases.

3.      In accordance with sections 35 of the Master Lease and 34 of the MOB Lease, immediately upon termination of the Ventas Leases, Samaritan shall execute and deliver to UK,

3

as Successor Operator and designee of Landlord, a bill of sale substantially in the form attached as Exhibit D conveying all Tenant's Personal Property relating to the leased property that constitutes a Fixture or Landlord's Personal Property as defined in the Ventas Leases, including without limitation Certificate of Needs ("CONS") (the "Transferred Property"). The Transferred Property shall be conveyed by Samaritan on an "AS IS WHERE IS" basis free and clear of all liens, claims, options, encumbrances and restrictions. Samaritan shall have no obligation to deliver the Transferred Property to any location other than the hospital or medical office building, it being understood and agreed that the presence of the Transferred Property at the hospital or medical office building on the Termination Date shall constitute delivery thereof. The following assets are specifically excluded from the Transferred Assets and shall be retained by Samaritan (the "Retained Property") for later sale as contemplated in this Agreement:

i)      Certain equipment;

ii)     All inventories of every kind and nature whatsoever including, but not limited to, all food, pharmacy, medical, office, maintenance and other supplies located at and relating to the hospital;

iii)    All accounts receivable relating to services rendered prior to the Termination Date;

iv)     All Intangible property; and

v)      Tenants' Personal Property not constituting a Fixture or Landlord's Personal Property as set forth in the Ventas Leases.

4

## ARTICLE 2

## TRANSITION

1.        As of the Termination Date, UK and Samaritan will enter into an operational transfer agreement ("OTA") acceptable to UK which will include but not be limited to the terms described below.  Notwithstanding anything in either this Agreement or the OTA to the contrary, UK will not be deemed to have assumed any obligation or liability of "Landlord" under the Ventas Leases.  Ventas shall execute and deliver a joinder to the OTA pursuant to which Ventas joins in the OTA for the purposes of designating (a) that UK shall be entitled to exercise all of the rights of Landlord under the Ventas Leases with respect to Section 37 of the Master Lease and Section 36 of the MOB Lease; (b) that UK shall be entitled to receipt of all property to be transferred upon termination of the Master Lease including but not limited to any Certificates of Need or other authorizations UK agrees to assume; and (c) that UK shall be entitled to exercise all other rights set forth in the OTA and the exhibits thereto.  The OTA shall include at a minimum the following:

i)        A transition period beginning with the Termination Date and ending on the earlier of the date UK gives written notice to Samaritan or 120 days after the Termination Date ("Transition Period");

ii)        Provide for management services of hospital during the Transition Period by UK;

iii)        Require Samaritan to cooperate in the orderly transition of employees and

contracts designated by UK during the Transition Period;

      iv)    Require execution of any documents by the parties reasonably necessary to effect the transition;

      v)    Require access by UK to all records, documents and agreements of Samaritan and its operations;

      vi)    Provide for Samaritan's and Associated's use of best efforts to obtain or assist UK in obtaining all necessary or appropriate consents and approvals of third parties and regulatory authorities to the transition and the transactions necessary to complete the transition including consents to assignments or amendments of contracts and estoppel certificates.

      vii)    Provide that UK will not operate under Samaritan's Medicare or Medicaid provider numbers; and

      viii)    Provide for Samaritan and Associated's non-competition, non-solicitation and no-hire provisions with reasonable time limits in favor of UK and KMSF; provided however, there will be a specific exclusion with respect to the non-competition covenant for the certificate of need ("CON") issued to Associated Healthcare Systems of Jessamine County, LLC and the CON application file by Associated Healthcare Systems of Jessamine County, LLC for the construction and operation of a 50-bed general acute hospital in Jessamine County, Kentucky.

      ix)    Provide for Associated's guaranty of Samaritan's obligations under the OTA and its representations and warranties thereunder.

      x)    In addition, under the terms of the OTA, Samaritan will honor the terms of

the Ventas Leases relative to "successor operators." Samaritan agrees that UK may take possession of contracts designated by UK prior to the end of the Transition Period in conformity with the bankruptcy provisions in Article 3, below, and may employ personnel directly, through KMSF, or through a designated affiliate or subsidiary.

xi)    In conformity with the bankruptcy provisions in Article 3, below, UK shall purchase Samaritan's assets free and clear of liabilities, and shall have the right to require Samaritan to assume or reject certain existing executory contracts, relative to the operations of Samaritan and to assign such assumed contracts to UK.  Any assumed liabilities and/or executory contracts will be designated by UK during the Transition Period.  UK will not assume any liability not designated and any liability not specifically assumed shall remain the responsibility of Samaritan, Ventas or Associated, whichever is currently responsible for such liabilities; provided that Ventas shall not be deemed to have assumed any obligation or liability by reason of this sentence.

2.    Ventas shall not assume any obligations or liabilities of Samaritan or Associated, provided, however, that Ventas shall not be relieved of any obligations under either (a) the Ventas Leases (except as otherwise provided herein), or (b) the New Lease with UK .

## ARTICLE 3
## BANKRUPTCY

1.    Samaritan and such affiliates of Samaritan as are necessary to be included shall after execution of this Agreement and the OTA and after the Termination Date, file a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court in the Eastern District of

7

Kentucky. Terms of the following pleadings to be filed in Samaritan's bankruptcy case shall be agreed between the Parties prior to the filing date, which shall be subject to bankruptcy court approval, as follows:

      i)      The tender of an Agreed Order authorizing the continued use by Samaritan of KMSF's collateral, while providing adequate protection of such interest, including authorizations of or carveouts for attorney fees and expenses for Samaritan's bankruptcy counsel;

      ii)     The tender of an Agreed Order authorizing the post-petition borrowing by Samaritan of the KMSF line of credit not to exceed $12,000,000, inclusive of the outstanding principal balance under the pre-petition loan documents among KMSF, Samaritan and others, or such other amount to which KMSF may agree;

      iii)    The tender of an Agreed Order approving the assumption of the OTA including the management agreement with UK, the form of which is attached to the OTA as an exhibit by Samaritan;

      iv)    The filing of a Motion and an Agreed Order of Sale of Samaritan's assets, excluding assets designated by UK as excluded assets, under 11 U.S.C. §363 to UK as the purchaser (or its designee) for a purchase price which would consist of the assumption of certain executory contracts designated by UK related to Samaritan's operations and cash in a sufficient amount to repay all amounts due and owing to KMSF plus such additional amounts as may be required to total $12,000,000. Any amount drawn on the KMSF line of credit above $12,000,000 shall be paid by Samaritan which shall grant KMSF an administrative expense

8

priority and a priority lien on Samaritan's accounts receivable for same. The purchase price shall

not exceed $12,000,000. The sale order shall provide for the sale of Samaritan's assets free and

clear of any and all liens, claims or encumbrances of Samaritan's creditors and any and all

successor liability. The sale order, with the approval of the court (which the Parties shall use

reasonable efforts to obtain so long as such efforts do not cause undue delay in having such order

approved by the court), will provide for Ventas to be released from any claims that the

bankruptcy estates might have against it, provided, however, that any failure of the court to

approve such provision shall not modify or alter any other term of this Master Agreement or any

other agreement between UK or KMSF and Ventas.

## ARTICLE 4

## WAIVERS, RELEASES AND APPROVALS

1.     As of the Termination Date, Samaritan and Associated shall be deemed to have

agreed to, for themselves and their personal representatives, successors and assigns, to release

and forever discharge UK and Ventas, their respective successors and assigns, agents,

representatives, employees, executives, officers, directors, trustees, attorneys, affiliates and

subsidiaries, from any and all causes of action, claims, demands, suits, damages, sums of money

and/or judgments relating to any claims Samaritan and/or Associated now have or may have had

or may have in the future collectively or individually or any damages, claims, costs, consent

expenses or additional rent that they might otherwise claim as the result of or arising out of acts

or omissions with respect to (a) terminations of the Ventas Leases, (b) the LOI and the

termination thereof, or (c) Samaritan, Associated or their affiliates' bankruptcy estates.

2.     As of the Termination Date, each of UK and Ventas shall be deemed to have

agreed, for itself and its personal representatives, successors and assigns, to release and forever

discharge the other, and the other's successors and assigns, agents, representatives, employees,

executives, officers, directors, trustees, attorneys, affiliates and subsidiaries in their capacities as

such, from any and all causes of action, claims, demands, suits, damages, sums of money and/or

judgments relating to any claims they now have or may have had collectively or individually or

any damages, claims, costs, consent expenses or additional rent that they might otherwise claim

as the result of or arising out of acts or omissions with respect to (a) terminations of the Ventas

Leases, or (b) Samaritan, Associated or their affiliates' bankruptcies, or (c) the LOI or the

termination thereof, but excluding in any event any claim for any breach of a contractual

obligation, including this Agreement the Intercreditor Agreement (defined below), and the New

Lease.

3.     Pursuant to section 6(c) of that certain Intercreditor Agreement (the "Intercreditor

Agreement") dated October 18, 2005 between Ventas and KMSF, before Ventas can take an

Enforcement Action, it is required to provide KMSF 30 days prior notice (except that Ventas

may take an Enforcement Action only with respect to any Ventas Priority Collateral that is

subject to any Exigent Circumstance upon prior written notice to KMSF).  Termination of the

Ventas Leases and the related actions described in this Agreement ("Termination Action")

constitute Enforcement Actions.  KMSF hereby waives the 30-day notice requirement under the

Intercreditor Agreement solely as it relates to Ventas taking Termination Actions.  Ventas shall

indemnify and hold UK harmless from any and all claims, demands, costs and expenses brought

against UK or incurred by UK in the removal of liens encumbering the leased premises arising

10

on or prior to the Termination Date but not affecting the leased premises until after the

Termination Date. KMSF expressly does not waive any other rights or notices to which it is

entitled pursuant to the terms of the Intercreditor Agreement or any other agreement with any of

the Parties, including without limitation (a) 30 days prior notice of any Enforcement Action

proposed to be taken by Ventas other than Termination Actions, and (b) the priority of the GECC

Liens on Accounts Collateral acquired, originated or arising prior to the date that is 30 days after

KMSF has received a copy of the Termination and Transition Notice. As used in this section,

"Enforcement Action," "GECC Liens" and "Accounts Collateral" shall have the meanings

ascribed to such terms in the Intercreditor Agreement. Except with respect to a breach of this

Agreement, UK shall make no claim to or against any cash deposits, securities, collateral or

letters of credit held by or for the benefit of Ventas. Notwithstanding anything in this Agreement

to the contrary, in the event that KMSF allows use of its cash collateral or provides debtor in

possession financing in Samaritan's and/or AHS Lexington's bankruptcies, Ventas agrees that

KMSF shall continue to have a first priority lien in pre-petition and post-petition accounts

receivable of Samaritan and/or AHS Lexington's, as applicable.

    4.    It shall be a condition precedent to UK's obligations under Article III of this

Agreement that all of the following shall have occurred prior to the filing of the Motion and an

Agreed Order of Sale, unless waived by UK:

    i)    Consents and approvals from all third parties deemed necessary or

appropriate by UK in connection with the transaction contemplated under this Master Agreement

have been obtained;

11

ii)    The Chapter 11 bankruptcy cases mentioned in Article III shall have been

filed in the U.S. Bankruptcy Court, Eastern District of Kentucky, Central Division at Lexington,

Kentucky, and that Court shall have attained and retained jurisdiction over such cases;

iii)    The Agreed Order of Sale shall be entered and become final on or before

120 days after the date the petitions in bankruptcy are filed; and

iv)    No defaults shall have occurred under this Master Agreement.

## ARTICLE 5

### GENERAL PROVISIONS

1.    The LOI and all obligations thereunder are terminated.  The parties acknowledge

and agree that no party has or shall have any liability or obligation under any section of the LOI.

2.    Conduct of Business.  Until the end of the Transition Period, Samaritan and

Associated will operate the hospital and medical office building in the ordinary course and

refrain from any extraordinary transactions, including:

i)    disposing of any assets, except in the ordinary course of business;

ii)    increasing the annual level of compensation of any Samaritan employee,

and not granting any unusual or extraordinary bonuses, benefits or other forms of direct or

indirect compensation to any Samaritan employee, officer, director or consultant, including any

person employed or engaged by Associated to provide services to Samaritan;

iii)    increasing, terminating, amending, or otherwise modifying any plan for

12

the benefit of Samaritan employees or modifying any plan for the benefit of any other employee of Samaritan or Associated that would result in a change in a plan for the benefit of Samaritan employees;

iv)    entering into any other agreement (or group of agreements) relating to the Samaritan operations, the performance of which will extend beyond the end of the Transition Period and involve consideration in excess of $10,000, without UK's prior consent;

v)    issuing any equity securities, options, warrants, rights or convertible securities of Samaritan and declaring or paying any dividends or distributions of Samaritan or AHS Lexington;

vi)    expending any funds for capital improvements, other than for equipment and scheduled maintenance in an amount not to exceed $10,000 except with UK's prior approval or in cases of emergency; or

vii)    entering into any managed care contracts, third party payor or governmental contracts without prior consent of UK.

Notwithstanding the above, upon the filing of the petitions described in Article III, Samaritan and Associated shall operate the business, the hospital and the medical office building only in accordance with the restrictive conditions contained in the interim and final cash collateral orders and the Chapter 11 Operating Order as entered in the Bankruptcy Court record.

3.    Confidentiality.  Until the filing of the petitions described in Article III, the Nondisclosure Agreement dated January 29, 2007 (the "Confidentiality Agreement") shall continue to govern the conduct of the Parties with respect to the transactions described in this

13

Master Agreement. The Parties understand and agree that money damages would not be sufficient remedy for any breach of this section 3 and that each Party will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies will not be deemed to be the exclusive remedies for any such breach, but will be in addition to all other remedies available at law or in equity. Upon the written request of Ventas, the other Party will promptly return to Ventas any Confidential Information in its possession. Upon the filing of such petitions, neither Samaritan nor UK nor Ventas shall be subject to the terms of the Confidentiality Agreement. This Agreement will supersede the Confidentiality Agreement to the extent there are conflicts between the agreements.

4.   Disclosure. Notwithstanding the provisions of the Confidentiality Agreement, prior to the filing of the petitions, UK may take all steps and make all statements contemplated in the communication plan attached to this Agreement as Exhibit E. Upon the filing of such petitions, UK may make such disclosures concerning the transactions contemplated under this Agreement as may be in the best interest of UK as determined by UK in its sole discretion.

5.   This Agreement shall be governed in accordance with the laws of the Commonwealth of Kentucky. Any litigation under the terms of this Agreement will be filed and pursued in Franklin Circuit Court, Frankfort, Kentucky or in the Bankruptcy Court in the Eastern District of Kentucky.

6.   Samaritan agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence

14

their rights hereunder. Ventas and UK shall execute such documents and instruments as are contemplated by this Agreement and the New Lease and reasonably cooperate with one another in connection therewith.

7.     Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, whether or not the transactions are consummated, except that Samaritan, AHS and Associated agree that they are obligated to reimburse Ventas for all of its costs and expenses relating to the transactions contemplated by this Agreement pursuant to the Ventas Leases, and that such obligation is secured by any security given to Ventas under the Ventas Leases.  Notwithstanding any provision in the New Lease to the contrary, UK is not obligated to Ventas for any of its costs and expenses relating to the transaction contemplated by this Agreement, including any cost or expense incurred relating to the bankruptcy proceedings contemplated by this Agreement, and Ventas waives any claim for reimbursement of such costs and expenses under the New Lease.

8.     Neither this Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by any party hereto without the express prior written consent of the other parties hereto except as provided herein.

9.     Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties hereto with respect to the subject matter hereof.  The Parties hereto do not intend that any third party shall have any rights under this Agreement.

15

10.    The Article and section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

11.    Insider Trading. Each party hereto acknowledges that it is aware, and that it will advise its qualified persons who are informed as to the matters that are the subject of this letter agreement, that federal and many state securities laws prohibit any person who has received from an issuer material, non-public information, from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

12.    Entire Agreement; Amendment; Successors; Assignment. This Agreement (a) constitutes the entire agreement (other than the Confidentiality Agreement) among the Parties relating to the subject matter hereof and supersedes all prior oral or written agreements, understandings, representations and warranties and courses of conduct and dealing among the Parties on such subject matter; (b) may be amended or modified only by a writing executed by all of the Parties; and (c) is binding on the Parties and their respective heirs, personal representatives, successors, and permitted assigns.

13.    This Agreement may be executed in one or more counterparts and all such counterparts taken together shall constitute a single original Agreement.

14.    In the event this Agreement is executed and delivered by Ventas, UK and KMSF:

i)    Sections 1 and 2 of Article 1, Section 2 of Article 2, Sections 2 and 3 of Article 4, and all Sections of Article 5 except Section 2 (and only the foregoing sections) shall be

16

effective and constitute the agreement between Ventas, UK and KMSF. If the agreement is later executed and delivered by Associated, then all sections hereof shall be effective.

   ii)  UK, KMSF and Ventas shall use reasonable efforts to obtain (so long as such efforts do not cause undue delay in having such order approved by the court), in connection with any purchase of assets by UK or KMSF from any bankruptcy proceeding for any of the persons comprising Associated, an order from the court that provides for Ventas to be released from any claims that the bankruptcy estate(s) might have against it, provided, however, that any failure of the court to approve such provision shall not modify or alter any other term of this Master Agreement or any other agreement between UK or KMSF and Ventas.

**SIGNATURES FOLLOW ON NEXT PAGE**

17

SAMARITAN ALLIANCE, LLC

By: _____
    A. Ronald Turner, President

ASSOCIATED HEALTHCARE
SYSTEMS, INC.

By: _____
    A. Ronald Turner, President

ASSOCIATED HEALTHCARE
SYSTEMS OF LEXINGTON, LLC

By: _____
    A. Ronald Turner, President

VENTAS REALTY, LIMITED
PARTNERSHIP

By: _____
Its: _____

UNIVERSITY OF KENTUCKY

By: _____
    Sergio Melgar, Vice President and
    Chief Financial Officer

KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.

By: _____
    Sergio Melgar, Vice President and
    Chief Financial Officer, University
    of Kentucky

18

SAMARITAN ALLIANCE, LLC

By: _____
    A. Ronald Turner, President


ASSOCIATED HEALTHCARE
SYSTEMS OF LEXINGTON, LLC

By: _____
    A. Ronald Turner, President


UNIVERSITY OF KENTUCKY


By: _____
    Sergio Melgar, Vice President and
    Chief Financial Officer


ASSOCIATED HEALTHCARE
SYSTEMS, INC.

By: _____
    A. Ronald Turner, President


VENTAS REALTY, LIMITED
PARTNERSHIP
By: Ventas, Inc., its general partner
By: _____
Its:    RAYMOND J. LEWIS
EXECUTIVE VICE PRESIDENT AND
   CHIEF INVESTMENT OFFICER


KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.


By: _____
    Sergio Melgar, Vice President and
    Chief Financial Officer, University
    of Kentucky


18

SAMARITAN ALLIANCE, LLC

By: _____
A. Ronald Turner, President


ASSOCIATED HEALTHCARE
SYSTEMS OF LEXINGTON, LLC

By: _____
A. Ronald Turner, President


UNIVERSITY OF KENTUCKY


By: _____
Sergio Melgar, Vice President and
Chief Financial Officer


ASSOCIATED HEALTHCARE
SYSTEMS, INC.

By: _____
A. Ronald Turner, President


VENTAS REALTY, LIMITED
PARTNERSHIP
By: Ventas, Inc., its general partner
By: _____
Its: RAYMOND J. LEWIS
EXECUTIVE VICE PRESIDENT AND
CHIEF INVESTMENT OFFICER


KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.


By: _____
Sergio Melgar, Vice President and
Chief Financial Officer, University
of Kentucky

18

**SAMARITAN ALLIANCE, LLC**

By: _A. Ronald Turner_
A. Ronald Turner, President

**ASSOCIATED HEALTHCARE
SYSTEMS, INC.**

By: _A. Ronald Turner_
A. Ronald Turner, President

**ASSOCIATED HEALTHCARE
SYSTEMS OF LEXINGTON, LLC**

By: _A. Ronald Turner_
A. Ronald Turner, President

**VENTAS REALTY, LIMITED
PARTNERSHIP**

By: _____
Its: _____

**UNIVERSITY OF KENTUCKY**

By: _Sergio Melgar_
Sergio Melgar, Vice President and
Chief Financial Officer

**KENTUCKY MEDICAL SERVICES
FOUNDATION, INC.**

By: _Sergio Melgar_
Sergio Melgar, Vice President and
Chief Financial Officer, University
of Kentucky

18

## EXHIBIT C

111 South Wacker Drive, Suite 4800, Chicago, Illinois 60606
Tel: (312) 660-3800  Fax: (312) 660-3850



# Fax

| To: | A. Ronald Turner | From: | Joe Lambert |
|-----|------------------|-------|-------------|
| **Fax:** | 615-370-3428 | **Pages:** | 3 |
| **Phone:** | | **Date:** | 4/12/2007 |
| **Re:** | | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

April 12, 2007

**BY FEDEX AND FACSIMILE**

| Associated Healthcare Systems, Inc. | Farris Mathews Branan Bobango Hellen & |
|---|---|
| 214 Overlook Court, Suite 260 | Dunlap PLC |
| Brentwood, Tennessee 37027 | 1100 Ridgeway Loop Road, Suite 400 |
| Attention: A. Ronald Turner, | Memphis, Tennessee 38120 |
| President & CEO | Attention: John Bobango, Esq. |

Re:    Master Lease Agreement (Hospital), dated February 1, 2005 (the "Hospital Lease"), between Ventas Realty, Limited Partnership ("Landlord") and Samaritan Alliance, LLC ("Tenant"), Master Lease Agreement (MOB), dated February 1, 2005 (the "MOB Lease", and together with the Hospital Lease, collectively, the "Leases") between Landlord and Tenant, Guaranty of Lease (MOB), dated February 1, 2005 (the "MOB Guaranty") executed by Associated Healthcare Systems, Inc. ("Guarantor") in favor of Landlord, and Guaranty of Lease (Hospital), dated February 1, 2005 (the "Hospital Guaranty", and, together with the MOB Guaranty, collectively, the "Guaranties") executed by Guarantor in favor of Landlord

Gentlemen:

Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Leases.

This letter notifies Tenant and Guarantor that Tenant has failed to perform its obligations under Section 8.2.6, 13 and 17.1.6 of each of the Leases. Such failures constitute immediate Events of Default under each of the Leases pursuant to Section 17.1.2 of each of the Leases, and Landlord may exercise any and all rights and remedies it may have available to it under the Leases, the Guaranties, at law, or in equity with respect to such Events of Default.

Therefore this letter also notifies Tenant and Guarantor that as a result of Events of Default and as one of its remedies, Landlord hereby immediately terminates the Leases in accordance with Section 17.2 of each of the Leases. As detailed below, pursuant to provisions of the Leases which survive their termination, we expect Tenant to honor its obligations under the Leases to transition the Leased Properties to be operated by a new operator, notwithstanding the termination of the Leases.

This letter constitutes Landlord's Transition Notice with respect to Landlord's election to require an Operational Transfer with respect to the Hospital Lease and the Leased Property thereunder (the "Hospital Property") pursuant to Section 37 of the Hospital Lease. The University of Kentucky is hereby designated as the "Successor Operator" with respect to the Hospital Property. As required by Section 37.3.3 of the Hospital Lease, Tenant shall hereafter operate the Facilities located on the Hospital Property in accordance with all of the requirements of the Hospital Lease until the time provided pursuant to such Section 37.3.3. Any subleases under the Hospital Lease other than that certain Lease Agreement dated June 14, 2002 between AHS Samaritan Hospital, LLC and Select Specialty Hospital – Lexington, Inc. have not been consented to by Ventas and therefore will terminate concurrently with the termination of the Hospital Lease.

410164_1.DOC

Page 2

       This letter constitutes Landlord's election to require an operational transfer with respect to the MOB Lease and the Leased Property thereunder (the "MOB Property") pursuant to Section 36 of the MOB Lease. The University of Kentucky is hereby designated as the "Successor Operator" with respect to the MOB Property. In connection therewith Landlord requires Tenant to furnish to Successor Operator complete and accurate books, records, files, documents and information in Tenant's possession, custody or control necessary or in connection with the transfer of operations of the Facility and/or the completion and processing of any applications for the assignment of any applicable service contracts, including without limitation such documents and information as Successor Operator may request directly of Tenant.

       Nothing contained in this letter is intended to limit, nor shall it be deemed to limit or in any way affect, any of Landlord's rights or remedies with respect to any current or future default or Event of Default under the Leases or the Guaranties. Nothing contained herein, nor any failure by Landlord to exercise any of its rights or remedies under the Leases or the Guaranties with respect to any existing or future default or Event of Default shall be deemed to constitute, nor is it intended to constitute, a waiver of any existing or future default or Event of Default under the Leases or the Guaranties or a waiver of Landlord's rights to pursue any and all of its rights and remedies under the Leases or the Guaranties. Any listing of defaults herein (or the facts or circumstances related thereto) is not intended to be, nor shall it be construed as, a complete listing of all defaults (or the facts or circumstances related thereto) or a waiver of any unlisted defaults. All rights and remedies of Ventas, whether at law or in equity, are expressly reserved.

Very truly yours,

Ventas Realty, Limited Partnership

By: Ventas, Inc., its sole general partner

By:
Name: RAYMOND J. LEWIS
Its: EXECUTIVE VICE PRESIDENT AND
CHIEF INVESTMENT OFFICER

418164_2.DOC